UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

WINTHROP RESOURCES
CORPORATION,

Case No. 07-CV-1735 (PJS/RLE)

Plaintiff,

ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT

v.

SABERT CORPORATION and SABERT
HOLDING CORPORATION,

Defendants.

---

Edward T. Wahl, Michael M. Krauss, and Nathaniel J. Zylstra, FAEGRE & BENSON, L.L.P., for plaintiff.

James L. Baillie and Matthew T. Boos, FREDRIKSON & BYRON, P.A., for defendants.

Plaintiff Winthrop Resources Corporation ("Winthrop") brings a claim for breach of a lease agreement against defendants Sabert Corporation and Sabert Holding Corporation (collectively "Sabert"). Sabert brings counterclaims for unjust enrichment and breach of contract. This matter is before the Court on Winthrop's motion for summary judgment on both its claim against Sabert and Sabert's counterclaims against it. For the reasons set forth below, the Court grants Winthrop's motion and enters judgment for Winthrop in the amount of $468,127.47.

## I. BACKGROUND

### A. The Lease

Winthrop is a financial-services company that leases computer and other equipment to corporate customers. In March 2003, Winthrop approached Sabert, a food-packaging manufacturer, about entering into a financing agreement for computer equipment that Sabert had recently purchased from third-party vendors. Pursuant to the parties' agreement, Winthrop

purchased the equipment and then leased it back to Sabert. *See* Defs.' Exs. 7, 9, 11 (June 2003 purchase agreements).

In May 2003, the parties executed a six-page lease agreement, titled Lease Agreement No. SA041003 ("the Lease"). The parties simultaneously executed a lease schedule listing the equipment that was subject to the Lease ("Schedule 001"). *See* Compl. Ex. A (hereinafter "Lease"); Pl.'s Ex. 5 (hereinafter "Sched. 001"). The Lease and Schedule 001 expressly incorporated each other. Six months later, in November 2003, the parties executed a new lease schedule ("Schedule 001R") that expressly replaced Schedule 001. *See* Compl. Ex. B (hereinafter "Sched. 001R"). Schedule 001R, which also expressly incorporated the Lease, included all the equipment listed in Schedule 001 as well as some additional equipment.

The parties' dispute centers on when the lease term began and when the lease term ended. Fortunately the contract clearly addresses both of these issues. The first numbered section of the Lease provides as follows:

> The term of this Lease Agreement, as to all Equipment designated on any particular Lease Schedule, shall commence on the Installation Date for all Equipment on such Lease Schedule and shall continue for an initial period ending that number of months from the Commencement Date as set forth in such Lease Schedule (the "Initial Term") and shall continue from year to year thereafter until terminated.

Lease § 1. Both schedules, in turn, state that the "Term of Lease from Commencement Date" is forty-two months. Sched. 001 at 1; Sched. 001R at 1.

Together, these clauses do several things. First, they establish that the lease term begins on the Installation Date, which is defined in the second numbered section of the Lease as follows:

> The Installation Date for each item of Equipment shall be the day
> said item of Equipment is installed at the Location of Installation,
> ready for use, and accepted in writing by the Lessee.

Lease § 2.  In other words, the lease term begins as to each item of equipment when that item of equipment is installed.

Next, the clauses establish that the Initial Term of the Lease concludes forty-two months after a *different* date — the Commencement Date.  The Commencement Date is defined in the second numbered section of the Lease as follows:

> The Commencement Date for any Lease Schedule is the first of the
> month following installation of *all* the Equipment on the Lease
> Schedule . . . .  The Lessee agrees to complete, execute and deliver
> a Certificate of Acceptance to Lessor upon installation of the
> Equipment.

Lease § 2 (emphasis added).  As this language makes clear, the Commencement Date as to the equipment listed on a particular lease schedule is the date on which the last item of equipment listed on that schedule is installed.  Put differently, the Commencement Date does not occur until *all* of the equipment on a particular lease schedule is "installed at the Location of Installation, ready for use, and accepted in writing by [Sabert]."  Lease § 2.

Suppose, for example, that a computer monitor was installed (and ready for use and accepted in writing) on July 1, 2003.  Sabert was obligated to *begin* making payments to Winthrop for the use of that monitor on July 1, 2003.  To calculate the date on which Sabert's obligations with respect to the monitor *concluded*, one would have to first identify the lease schedule on which the monitor was listed, then identify the date on which the last piece of equipment on that lease schedule was installed (that is, the Commencement Date), and finally count forty-two months forward from the first of the month following that date.

-3-

Obviously, then, the Lease contemplates that there may be an interim period between the Installation Date of a particular item of equipment, which is the beginning of the lease term as to that item of equipment, and the Commencement Date applicable to that item of equipment (and to all of the other equipment listed on the same lease schedule), which triggers the start of the forty-two month Initial Term of the Lease. The Lease expressly describes Sabert's payment obligations during that interim period:

> The Lease Charge for the period from the Installation Date to the Commencement Date shall be an amount equal to the 'Monthly Lease Charge' divided by thirty (30) and multiplied by the number of days from and including the Installation Date to the Commencement Date . . . .

Lease § 3. The schedules further provide that the monthly lease charge is "prorated and charged as interim rent between the date an item of equipment is accepted and the Commencement Date." Sched. 001; Sched. 001R.

Finally, it is critical to note that the Lease includes an "evergreen" clause stating that the Lease "shall continue from year to year thereafter until terminated." Lease § 1. Thus, although the Lease defines an Initial Term that ends forty-two months after the Commencement Date, the Initial Term is an *initial* term. The Lease does not automatically end upon the expiration of the Initial Term. Rather, the Lease automatically renews in one-year increments until it is terminated. Either party can terminate the Lease without cause at the end of the Initial Term, or at the end of any subsequent one-year term, by mailing a written notice of termination to the other party at least 120 days before the termination date. Lease § 1.

*B.  Sabert's Acceptance of Equipment on Schedule 001*

In June 2003, shortly after signing the Lease and Schedule 001, Sabert signed three acceptance forms for a total of $992,274.24 of equipment.  Ziznewski Aff. ¶¶ 12, 14; Defs.' Exs. 7-12.  Sabert contends that, because it accepted all of the equipment listed in Schedule 001 in June 2003, the Commencement Date for Schedule 001 was July 1, 2003.

Winthrop disagrees.  Winthrop points to a provision in Schedule 001 requiring Sabert to lease a minimum amount of hardware:  "Total cost of equipment on this lease schedule shall include a minimum of $155,000.00 of hardware."  Sched. 001.  According to Winthrop, Sabert accepted only $153,500.69 worth of hardware in June 2003 and did not reach the $155,000 threshold until the following November.  Thus, argues Winthrop, the Commencement Date of Schedule 001 was December 1, 2003.

The list of equipment in Schedule 001 is not detailed; instead, it is simply a list of four general categories of items under the heading "Equipment Description (including features)."  Sched. 001 at 2.  These four categories are "Application Software," "Maintenance and Installation Services," "Servers, Computers, and Peripherals," and "RF Equipment and Network Equipment."  Sched. 001 at 2.  In contrast, the certificates of acceptance that Sabert signed pursuant to Schedule 001 contain numerous pages of specifically described items of hardware, software, and services, including, where appropriate, make and model numbers.  Defs.' Exs. 8, 10, 12.  Because Schedule 001 only provides a very general description of various categories of equipment, it is not possible to cross-check the equipment listed in the certificates of acceptance against the equipment listed in Schedule 001 to determine if Sabert in fact accepted all of the equipment in Schedule 001.  Save for the dispute about the $155,000 in hardware, however, the

parties do not appear to dispute that by June 2003 Sabert had accepted all of the equipment contemplated in Schedule 001.

### C.  Schedule 001R

As noted, in November 2003 the parties executed Schedule 001R, which added some equipment to the Lease and adjusted the monthly lease charge accordingly.  At the top of Schedule 001R, directly underneath the title, the document states:  "This Lease Schedule No. 001R replaces Lease Schedule No. 001[.]"  Sched. 001R.

Aside from the monthly lease charge, Schedule 001R is very similar to Schedule 001. Like Schedule 001, Schedule 001R incorporates the Lease and states that the "Term of Lease from Commencement Date" is "42 months."  Like Schedule 001, Schedule 001R includes a list of equipment, all of which must be "installed" within the meaning of the Lease to trigger the Commencement Date of Schedule 001R.  And like Schedule 001, Schedule 001R states that "[t]he Monthly Lease Charge will be prorated and charged as interim rent between the date an item of equipment is accepted and the Commencement Date."

The list of equipment in Schedule 001R, however, is much more detailed and specific than the list in Schedule 001.  Schedule 001R includes every piece of equipment listed in the certificates of acceptance that Sabert signed back in June 2003 (with the exception of a couple of entries for professional fees and expenses that appear on the June 2003 acceptance certificates but not on Schedule 001R).  *Compare* Sched. 001R at 2-6, 9 *with* Defs.' Exs. 8, 10, 12.  Along with the equipment that Sabert had already accepted in June, Schedule 001R includes about two and a half pages of additional equipment.  *See* Sched. 001R at 6-8, 10.  On the same day that Sabert signed Schedule 001R (November 10, 2003), Sabert also signed a certificate of

acceptance for the new equipment listed in Schedule 001R.  Pl.'s Ex. 15.  Thus, as of

November 10, 2003, all of the equipment listed in Schedule 001R had been "installed at the

Location of Installation, ready for use, and accepted in writing by" Sabert.  Lease § 2.

### D.  The Parties' Dispute

Toward the end of 2006, Sabert received an invoice from Winthrop for January 2007.

Believing that the term of the Lease would end on December 31, 2006, Sabert contacted

Winthrop to ask about the invoice.  Ziznewski Aff. ¶ 24.  Winthrop informed Sabert that the

forty-two-month term did not begin until December 1, 2003, which was the first of the month

following Sabert's acceptance of all of the equipment on Schedule 001R.  Ziznewski Aff. ¶ 24;

Defs.' Ex. 44.  Thus, Winthrop told Sabert, the Initial Term would not end until May 31, 2007.

Ziznewski Aff. ¶ 24.

On January 8, 2007, Sabert sent a letter to Winthrop through its then-counsel, Lawrence

Goldman.  Defs.' Ex. 41.  The Goldman letter expressed Sabert's view that, although the parties'

transaction was structured as a lease, it was in substance a loan from Winthrop to Sabert that was

to be repaid over a lease term of forty-two months.  The letter further asserted that Sabert's

obligations under the Lease terminated with Sabert's December 2006 payment.  The letter also

asserted that the Commencement Date of the forty-two-month period was July 1, 2003 and that,

"[a]t most, Sabert may owe remaining rent payments on the November 2003 advance."  Defs.'

Ex. 41 at 2.  Sabert concluded the letter by stating that it would not make any more payments.

In response to Sabert's letter, Winthrop sent a letter pointing out that Schedule 001R

replaced Schedule 001 and that the Commencement Date of Schedule 001R was December 1,

2003.  Pl.'s Ex. 20.  Winthrop also expressly stated that it did not consider Sabert's letter a

notice of intent to terminate Schedule 001R: "Lease Schedule Number 001R remains in effect as

Winthrop has not received notice of Sabert's intention to terminate it." Pl.'s Ex. 20.[1]

After Sabert refused to make any more lease payments, Winthrop filed this action in

March 2007 for breach of the Lease. Sabert counterclaimed for unjust enrichment and breach of

contract. In August 2007, some four months after filing its answer and counterclaim, Sabert sent

a written termination notice to Winthrop pursuant to § 1 of the Lease. Defs.' Ex. 43.

## I. ANALYSIS

### A. Standard of Review

Winthrop moves for judgment on Sabert's counterclaims as well as for judgment in its

favor on its own claim. The Lease provides, and the parties agree, that Minnesota law applies to

their claims. Lease § 25.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute

---

[1]Apparently without noticing the discrepancy, each side has submitted a different version
of Winthrop's letter to the Court. *Compare* Pl.'s Ex. 20 *with* Defs.' Ex. 42. In particular,
Winthrop's version of the letter contains the language quoted in the text, but that language does
not appear in Sabert's version. The Court nevertheless accepts Winthrop's version as the true
version. It is obvious, from the Bates stamps on the two letters, that Winthrop originally
produced both versions to Sabert during discovery. But whereas Winthrop's version is signed
and printed on Winthrop letterhead with January 2007 fax information printed across the top,
Sabert's version is unsigned, is not printed on Winthrop letterhead, and bears no indicia of
having been faxed. Most importantly, during oral argument, the Court pointed out to Sabert that
Winthrop's letter expressly notified Sabert that Winthrop had not received notice of Sabert's
intent to terminate. *See* Hr'g Tr. 37, Dec. 3, 2007 [Docket No. 63]. Sabert did not dispute
the content of the letter as described by the Court. *Id.* It is thus apparent that there is no real dispute
that Sabert received Winthrop's version of the letter and that Sabert's version is an earlier draft
of the letter that Sabert obtained during discovery and inadvertently submitted to the Court.

over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for either party. *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir. 2006). In considering a motion for summary judgment, a court "must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party." *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004).

## B. Winthrop's Claim

### 1. The Commencement Date

Winthrop argues that, under the plain meaning of the Lease and the associated schedules, the Commencement Date for both Schedule 001 and Schedule 001R was December 1, 2003. The Court agrees that, under the unambiguous terms of the Lease and Schedule 001R, the Commencement Date for Schedule 001R was December 1, 2003. The Court further finds that, because nothing turns on the question of the Commencement Date for Schedule 001, the Court need not address it.

The primary goal of contract interpretation is to ascertain the intent of the parties. *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 323 (Minn. 2003). When the parties' agreement has been reduced to an unambiguous, integrated writing, their intent must be determined from the language of the written contract alone. *Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.*, 664 N.W.2d 303, 312-13 (Minn. 2003); *Metro. Sports Facilities Comm'n v. Gen. Mills, Inc.*, 470 N.W.2d 118, 123 (Minn. 1991). A contract is

ambiguous only if its language is reasonably susceptible to more than one interpretation. *Art Goebel, Inc. v. N. Suburban Agencies, Inc.*, 567 N.W.2d 511, 515 (Minn. 1997). The interpretation of an unambiguous written contract is a question of law for the Court. *Travertine Corp. v. Lexington-Silverwood*, 683 N.W.2d 267, 271 (Minn. 2004).

The Court holds that the Lease and Schedule 001R unambiguously provide that the Commencement Date for Schedule 001R was December 1, 2003.[2] On the very first page of the Lease, the Lease defines the Commencement Date as "the first of the month following installation of *all* the Equipment on the Lease Schedule . . . ." Lease § 2 (emphasis added). A piece of equipment is not considered "installed" until Sabert signs a certificate of acceptance for it. Lease § 2. As noted, Schedule 001R, which the parties executed in November 2003, contains a comprehensive list of equipment. Sabert had already accepted *some* of the equipment on Schedule 001R via certificates of acceptance that Sabert executed the previous June. But Schedule 001R also listed additional equipment that Sabert did not accept until November 10, 2003, and that equipment was therefore not "installed" until November 10. Thus, the Commencement Date — that is, "the first of the month following installation of *all* the

---

[2]The Court further holds that the contract is integrated. Section 25 of the Lease includes the following integration clause:

> There are no unwritten or oral agreements between the parties. This Lease Agreement and associated Lease Schedule(s) constitute the entire understanding and agreement between [Winthrop] and [Sabert] with respect to the lease of the Equipment superseding all prior agreements, understandings, negotiations, discussions, proposals, representations, promises, commitments and offers between the parties, whether oral or written.

Equipment" on Schedule 001R — was December 1, 2003.  The terms of the Lease and Schedule 001R could not be clearer.

Sabert contends that the Lease is ambiguous with respect to which schedule — Schedule 001 or Schedule 001R — governs the Commencement Date for the equipment that is listed on both schedules.  But Sabert's argument ignores the obvious point that Schedule 001R expressly superseded Schedule 001.  As noted, directly underneath the title of Schedule 001R, that document states:  "This Lease Schedule No. 001R replaces Lease Schedule No. 001[.]"  As further noted, Schedule 001R includes all of the equipment that was previously listed on Schedule 001 (as well as some additional equipment).  Thus, at the moment that the parties executed Schedule 001R, it was that schedule, and not Schedule 001, that defined their rights and obligations — including their rights and obligations with respect to equipment listed on both Schedule 001 and Schedule 001R.[3]

---

[3]Because Schedule 001R replaced Schedule 001, the Commencement Date of Schedule 001 is irrelevant.  That said, the Court notes that, if the Commencement Date of Schedule 001 was relevant, the Court would find that the Lease and Schedule 001 were ambiguous in addressing that issue.  As described above, Winthrop argues that the Commencement Date of Schedule 001 was December 1, 2003, because Schedule 001 required Sabert to lease a minimum of $155,000 worth of hardware, and Sabert did not meet that requirement until November 2003.  But Schedule 001 does not require Sabert to lease a minimum of $155,000 *worth* of hardware; instead, it states that "[t]otal *cost of equipment* on this lease schedule shall include a minimum of $155,000 of hardware."  Sched. 001 (emphasis added).  Sabert offers evidence that the total cost of the hardware that it accepted in June 2003 was $159,549.23.  Defs.' Ex. 47.  Winthrop argues that the $159,549.23 figure includes "soft costs" such as shipping and tax, and that excluding those costs puts the cost of the hardware below $155,000.  But Sabert notes that, under generally accepted accounting principles, shipping and tax are considered part of the "cost" of property.  At a minimum, therefore, Schedule 001 is ambiguous with respect to whether shipping and tax would be considered part of the "cost of equipment."  Thus, if the question of the Commencement Date of Schedule 001 were relevant, the issue would have to be decided by a jury.

Sabert points to a host of extrinsic evidence to argue that the parties intended the actual substance of their transaction to be a loan with a 3.7% interest rate that was to be repaid in forty-two monthly installments.  The purpose of Schedule 001R, Sabert argues, was to adjust the monthly "lease" payment (really a loan payment, in Sabert's view) to account for a small amount of additional principal ($13,561) that Sabert borrowed in November 2003.  It would be irrational, Sabert argues, for it to agree to make a number of additional "lease" payments of over $25,000 per month in return for a loan of an additional $13,561.  Thus, Sabert contends, the parties could not have intended for Schedule 001R to restart the forty-two-month Initial Term of the Lease as of December 1, 2003.

The problem with Sabert's argument is that it depends entirely on extrinsic evidence.  As already noted, Minnesota law is clear that a court may not consider extrinsic evidence in interpreting a written contract that is both unambiguous and integrated.  The Lease and Schedule 001R comprise such a contract.  Under the terms of that contract, the parties entered into a straightforward lease of equipment, and Schedule 001R simply extended that lease and added additional equipment.  The terms of the Lease, including the Commencement Date of Schedule 001R, are clear on the face of the documents.  The fact that the contract represents a bad deal for Sabert does not excuse Sabert from performance:  "If a contract is unambiguous, the 'contract language must be given its plain and ordinary meaning, and shall be enforced by courts even if the result is harsh.'"  *Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346-47 (Minn. 2003) (quoting *Minneapolis Pub. Hous. Auth. v. Lor*, 591 N.W.2d 700, 704 (Minn. 1999)).[4]

---

[4]Sabert points out that the Lease is considered a "finance lease" under the Uniform Commercial Code, *see* Minn. Stat. § 336.2A-103(1)(g), but Sabert does not explain why or how that fact should affect the Court's analysis.

-12-

2.  The Termination Date

The Court has found that, pursuant to the unambiguous terms of the Lease and Schedule 001R, the Commencement Date of Schedule 001R was December 1, 2003.  Pursuant to § 1 of the Lease, therefore, the Initial Term of the Lease ended forty-two months later, on May 31, 2007.  That answers the question of when the *Initial Term* ended, but it does not answer the question of when the *Lease* ended, because, as described above, the Lease contains an evergreen clause pursuant to which the Lease automatically renews each year unless one of the parties sends a written termination notice at least 120 days before the termination date. Winthrop argues that, because Sabert did not send a written termination notice until August 2007, the Lease automatically renewed on June 1, 2007 and did not end until May 31, 2008.

Sabert contends that, for two reasons, the Lease did not renew on June 1, 2007:

First, Sabert points to the schedules, both of which include the following statement: "Term of Lease from Commencement Date:  42 Months."  Sched. 001; Sched. 001R.  This specific language, Sabert argues, controls over any general language in the Lease regarding the length of the Lease term.  But Sabert's argument ignores the fact that the language on which Winthrop relies — the evergreen clause — concerns the *renewal* of the Lease term.  The fact that the *initial term* of the Lease is forty-two months does not change the fact that the Lease automatically *renews* each year.  When read as a whole, the Lease and the schedules are unambiguous on this point:  The Lease runs for an Initial Term of forty-two months from the Commencement Date, after which the Lease automatically renews each year until it is terminated by one or both of the parties.

-13-

Second, Sabert argues that its former counsel, Lawrence Goldman, sent a termination notice to Winthrop on January 8, 2007, which was more than 120 days before May 31, 2007. *See* Defs.' Ex. 41.  Thus, Sabert argues, the evergreen clause had no effect and the Lease terminated, at the latest, on May 31, 2007.[5]

No reasonable jury could agree with Sabert that the Goldman letter was a termination notice within the meaning of the Lease.  The letter does not purport to terminate anything; to the contrary, the letter discusses the Lease as though it contained a single non-renewable forty-two month term that had already ended.[6]  In other words, the letter plainly betrays the fact that Goldman was *unaware* of the evergreen clause and the need for one party or the other to provide a termination notice.  The Goldman letter was obviously not intended to terminate a lease that, in Sabert's view, had already become a dead letter.

Moreover, there is not a shred of contemporaneous extrinsic evidence that either Sabert or Winthrop understood Goldman to be providing a termination notice under the Lease.  To the contrary, in its response to Goldman's letter, Winthrop expressly informed Sabert that it did not consider Sabert's letter to be a notice of termination:  "Lease Schedule Number 001R remains in effect as Winthrop has not received notice of Sabert's intention to terminate it."  Pl.'s Ex. 20. Despite receiving this explicit warning in January 2007, Sabert did nothing until August 29,

---

[5]The Court notes that Sabert's argument that the Commencement Date of the Lease was July 1, 2003 puts it in something of a bind.  If Sabert is correct that the Commencement Date was July 1, 2003, the Initial Term of the Lease ended on December 31, 2006.  Goldman's January 2007 letter would thus have come too late to prevent the renewal of the Lease under the evergreen clause.  At the earliest, therefore, the Lease would have ended on December 31, 2007.

[6]"We believe that Sabert's obligations under the Lease terminated with the 'rent' payment made for the month of December 2006. . . .  [W]e look forward to receipt of an acknowledgement from you that the Lease term has been concluded."  Defs.' Ex. 41 at 1, 3.

2007, when it finally sent a termination notice.  Defs.' Ex. 43.  Notably, that termination notice is quite different in language and tone, further highlighting the fact that the Goldman letter was not a termination notice.

Sabert thus did not provide an effective termination notice until August 29, 2007, well after the Lease term had automatically renewed pursuant to the evergreen clause.  The Court therefore holds that the Lease automatically renewed on June 1, 2007 and did not end until May 31, 2008.

### 3.  Sabert's Affirmative Defenses

Sabert raises a number of affirmative defenses to the Lease, including misrepresentation, mistake, and equitable estoppel.  These defenses are all based on two alleged misrepresentations. First, Sabert alleges that the entire Lease is voidable because Winthrop failed to disclose its intent to charge lease payments beyond the forty-two-month term identified in the schedules. According to Sabert, this failure amounts to a misrepresentation of Winthrop's "state of mind." Second, Sabert alleges that Schedule 001R is voidable because Winthrop misrepresented the purpose of Schedule 001R.  Specifically, Sabert alleges that Winthrop told Sabert that the "only" purpose of Schedule 001R was to adjust the monthly lease charge, when in fact Schedule 001R also had the effect of re-setting the Commencement Date to December 1, 2003 and thus extending the Initial Term of the Lease through May 2007.

The problem with Sabert's arguments is that they boil down to a complaint that Winthrop failed to disclose what was clearly disclosed on the face of the contract itself.  The Court cannot emphasize this point strongly enough:  The Lease and the associated schedules are short and to the point.  All of the information that Sabert claims was misrepresented appears on the face of

the Lease, and nearly all of it appears on the first page of the Lease — indeed, in the very first paragraph.  No one who reads the Lease — certainly no one who, like Sabert's representative, is experienced in reviewing and signing contracts — could fail to understand that the term of the Lease was longer than forty-two months.  Similarly, no one who reads Schedule 001R could fail to understand that the Commencement Date for the forty-two month period was December 1, 2003.  Sabert is in essence complaining that Winthrop failed to tell it what was plainly disclosed on the face of the contract.

This is sufficient to defeat Sabert's affirmative defenses.  But the Court also notes that Sabert's own conduct demonstrates that it must have been aware that the term of the Lease was longer than forty-two months.  Sabert paid interim rent for the month of June 2003, which, at a minimum, meant that Sabert understood the term of the Lease to be at least forty-*three* months.  Similarly, Sabert's claimed belief that Schedule 001R did not restart the forty-two month period is hard to reconcile with the fact that Sabert was entering into a lease that included additional equipment.  Under Sabert's theory, Sabert's repayment obligation for the newly installed equipment would have started with the sixth lease payment.  It is hard to understand how Sabert could believe that the lease term on the newly installed equipment was *less* than forty-two months.

In any event, in the absence of fraud or misrepresentation, a person who signs a contract may not avoid it on the ground that he did not read it or thought its terms were different. *Gartner v. Eikill*, 319 N.W.2d 397, 398 (Minn. 1982).  Sabert attempts to avoid this general rule by offering extrinsic evidence of alleged misrepresentations.  But the parol-evidence rule bars extrinsic evidence of alleged misrepresentations if the written contract explicitly states terms that

are "completely antithetical to the claimed misrepresentations." *Clements Auto Co. v. Serv.*

*Bureau Corp.*, 444 F.2d 169, 179 (8th Cir. 1971) (citing *Vint v. Nelson*, 127 N.W.2d 177 (Minn.

1964)).  If, for example, a written agreement specifies that a lessee will pay rent of $100 per

month to the lessor, the lessee cannot introduce extrinsic evidence that the lessor said that the

rent would be only $90 per month.  A lessee who is promised a rate of $90 per month should not

sign a contract obligating it to pay $100 per month.

In this case, both of the alleged misrepresentations — that Winthrop would only charge

for forty-two months' rent, and that the only purpose of Schedule 001R was to adjust the

monthly charge — are completely contradicted by the plain terms of the written documents.

Sabert is charged with knowledge of those terms.  Sabert cannot evade the parol-evidence rule

by alleging that Winthrop misrepresented terms that are expressly disclosed in the parties'

written agreement.  A contrary holding would render the parol-evidence rule meaningless.

Sabert's reliance on the defense of unilateral mistake is similarly meritless.  Generally, a

party cannot avoid a contract on the basis of its own unilateral mistake unless there is ambiguity,

fraud, or misrepresentation.  *TNT Props., Ltd. v. Tri-Star Developers LLC*, 677 N.W.2d 94, 102

(Minn. Ct. App. 2004).  As explained above, there is no ambiguity, fraud, or misrepresentation in

this case.  The Lease and Schedule 001R are crystal clear that the Lease term was longer than

forty-two months and that the Commencement Date for the forty-two month period was

December 1, 2003.  The parol-evidence rule bars any extrinsic evidence of representations to the

contrary.

It is true that a court may rescind a contract on the basis of one party's unilateral mistake

— even in the absence of fraud or misrepresentation — when enforcement would impose an

"oppressive burden" and rescission would not prejudice the other party.  *Gethsemane Lutheran Church v. Zacho*, 104 N.W.2d 645, 649 (Minn. 1960); *cf. TNT Props., Ltd.*, 677 N.W.2d at 102 (recognizing that unilateral mistake may be the basis for rescission where the contract may be rescinded without prejudice to the other party).  But Sabert does not argue that the Lease could be rescinded without prejudice to Winthrop.  Even if the Lease could be rescinded without prejudice to Winthrop — which seems doubtful, as computer equipment is a fast-depreciating asset — it appears that Minnesota courts would still not permit rescission in these circumstances:

> [I]t is equally clear that in the interest of preserving some reasonable stability in commercial transactions the courts will not set aside contractual obligations, particularly where they are embodied in written contracts, merely because one of the parties claims to have been ignorant of or misunderstood the provisions of the contract.

*Gethsemane Lutheran Church*, 104 N.W.2d at 649; *see also Gartner*, 319 N.W.2d at 398 (in the absence of fraud or misrepresentation, mistake as to contents of contract is no basis to avoid the contract).  Sabert is thus not entitled to rescission on the basis of unilateral mistake.

Finally, Sabert argues that Winthrop should be equitably estopped from asserting that Sabert breached the Lease.  This defense largely overlaps with Sabert's defenses of misrepresentation and mistake, and fails for the same reasons.  In particular, to prevail on the defense of equitable estoppel, a party must demonstrate "'acts, language or silence amounting to a representation or a concealment of material facts.'"  *Brekke v. THM Biomedical, Inc.*, 683 N.W.2d 771, 777 (Minn. 2004) (quoting *Lunning v. Land O'Lakes*, 303 N.W.2d 452, 457 (Minn. 1980)).  Again, Sabert's contentions boil down to a complaint that Winthrop did not tell it what was plain on the face of the contract it signed.  Sabert's equitable-estoppel defense therefore

fails, and Winthrop is entitled to summary judgment in its favor on its claim for breach of the Lease.[7]

### C.  Sabert's Counterclaims

Winthrop also moves for summary judgment on Sabert's three counterclaims.

Under its first counterclaim, for unjust enrichment, Sabert argues that if the Commencement Date of the Lease was December 1, 2003, then Winthrop has been unjustly enriched by the amount of rent that Sabert paid from July through November 2003.  But the parties have an express contractual agreement under which Winthrop was entitled to lease payments from July through November 2003, and thus Sabert's unjust-enrichment claim to recover those payments is without merit.  *See U.S. Fire Ins. Co. v. Minn. State Zoological Bd.*, 307 N.W.2d 490, 497 (Minn. 1981) (equitable relief cannot be granted where the rights of the parties are governed by a valid contract).  There is nothing "unjust" about Winthrop receiving payments that Sabert promised to make pursuant to the terms of a clear and valid contract.

Sabert's remaining counterclaims — for breach of contract and unjust enrichment — relate to the $25,576 security deposit that Sabert gave to Winthrop pursuant to Schedule 001R. Sabert contends that Winthrop breached the Lease (and was unjustly enriched) because Winthrop has not applied that amount toward the final lease payment.

---

[7]Sabert also argues that Winthrop should be estopped from arguing that the Lease term automatically renewed at the end of May 2007 because in December 2006 a Winthrop representative told Sabert that the "lease does not expire til May."  Defs.' Mem. Opp. Summ. J. 46.  That statement was not a misrepresentation, however; the Initial Term of the Lease did expire at the end of May 2007.  Pursuant to the evergreen clause, however, the Lease automatically renewed on June 1, 2007.  Sabert's failure to understand the terms of an unambiguous contract is not a sound basis for applying the doctrine of equitable estoppel.

Schedule 001R states that "*[i]f there is no event of default, this security deposit will be applied toward the total Lease Charges associated with the last month of this Lease Schedule.*" Sched. 001R (emphasis added).  But, as the Court has found, Sabert's failure to make any lease payments after December 2006 is an event of default.  Lease § 16(1).  Winthrop is therefore under no obligation to apply Sabert's security deposit to Sabert's last rental payment under the Lease.

Winthrop's motion for summary judgment is granted with respect to all of Sabert's counterclaims.

### D.  *Winthrop's Recovery*

The Court has found that there is no genuine issue as to any material fact and that the term of the Lease continued until May 31, 2008.  Sabert's failure to pay any lease charges since December 2006 is an event of default entitling Winthrop to recover past-due rent, late charges, and accelerated rent, as well as attorney's fees, costs, and expenses incurred in connection with this case.  Lease §§ 16-18.  Winthrop asserts that as of the date of its motion it was entitled to past-due rent of $255,760.00,[8] late charges of $36,862.10, and accelerated rent of $175,505.37, for a total of $468,127.47.  Sabert does not dispute these calculations, and the Court will therefore order judgment for Winthrop in that amount.

Finally, pursuant to § 17 of the Lease, Winthrop is entitled to the return of its computer equipment.  Sabert argues that Winthrop has not provided written instructions regarding where

---

[8]Winthrop's memorandum erroneously states that it is entitled to past due rent of $355,760.00.  *See* Pl.'s Mem. Supp. Summ. J. 15.  It is obvious, from Winthrop's calculations and the invoices that Winthrop submitted, that the first digit of the past-due figure in Winthrop's memorandum should be a "2" instead of a "3."

Sabert should return the equipment, as required by § 7 of the Lease, and that therefore Sabert has

not defaulted on its obligation to return the equipment.  Sabert's argument misses the point; it is

Sabert's default on its *payment obligations* that entitles Winthrop to the return of the equipment

under § 17, and § 17 permits Winthrop to choose among various methods of repossessing its

equipment, including (but not limited to) the procedure described in § 7.  The Court will

therefore declare that Winthrop is entitled to the return of its equipment, which will permit

Winthrop to proceed to repossess that equipment under § 17.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT:

1.      Plaintiff's motion for summary judgment [Docket No. 19] is GRANTED.

2.      Plaintiff shall recover $468,127.47 from defendants.

3.      Plaintiff is entitled to the return of the equipment leased to defendants pursuant to

        Lease Agreement No. SA041003.

4.      Plaintiff is entitled to recover its attorney's fees, costs, and expenses incurred as a

        result of defendants' breach of Lease Agreement No. SA041003.

5.      Within ten days of the date of this order, plaintiff shall file and serve a detailed

        affidavit and supporting documentation for its attorney's fees, costs, and

        expenses.  Defendants may file and serve a response of no more than 4000 words

        within ten days after the date plaintiff files and serves its affidavit.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: June 20, 2008

s/Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge